106 Cal.Rptr.2d 702 (2001)
88 Cal.App.4th 903
Arthur CHAMBERS, Plaintiff and Appellant,
v.
Philip KAY, Defendant and Respondent.
No. A091362.
Court of Appeal, First District, Division One.
April 30, 2001.
As Modified May 24, 2001.
Review Granted July 11, 2001.
*706 Werchick & Werchick, Arne Werchick, Truckee, Bornstein & Bornstein Jonathan H. Bornstein, San Francisco, Law Offices of Joel D. Adler, Joel Adler, San Francisco, for plaintiff and appellant.
Sedgwick, Detert, Moran & Arnold, Steven D. Wasserman, Thomas F. Kopshever, San Francisco, Law Offices of Philip Edward Kay, Philip Edward Kay, San Francisco, Lawrence Anthony Organ, for defendant and respondent.
SWAGER, J.
The issues now before us arise from a dispute between two attorneys over fees generated from the successful prosecution of a case previously before us. (See Weeks v. Baker & McKenzie (1998) 63 Cal. App.4th 1128, 74 Cal.Rptr.2d 510.) The trial court entered judgment against appellant in his action for breach of an agreement with respondent for division of attorney fees. The trial court found that the agreement violated rule 2-200 of the Rules of Professional Conduct, and appellant's action for quantum meruit barred by the lapse of the two-year statute of limitations. We conclude that appellant cannot recover a portion of the contingent fee under the agreement, but is entitled to proceed with his claim for quantum meruit.

STATEMENT OF FACTS AND PROCEDURAL HISTORY
Appellant and respondent were attorneys with separate law practices in San Francisco. They had individual office letterheads, and respondent listed his professional address as his home law office on 43rd Avenue. Respondent also maintained a separate professional liability insurance policy for his practice. Appellant and respondent did not list each other as employees or partners in any official documents they filed.
However, in accordance with an "arrangement" between appellant and respondent, they shared office space in 1992 and 1993. Respondent rented a conference room in appellant's office building on Sutter *707 Street for $200 per month, to meet with clients and conduct depositions. Although apparently not part of the formal arrangement, respondent also customarily used appellant's office telephone service, law library, postage, fax and copy machines, maintained files and a computer in the office, rented a monthly parking space in the building parking lot, and was listed as a "co-tenant" on the building directory. Appellant "assisted" respondent with his work on a few cases. In addition, appellant's staff "regularly" provided assistance to respondent with "case-related documents."
During 1993, at respondent's request appellant became "co-counsel" in a sexual harassment action previously filed by respondent on behalf of his clients, Rena Weeks and Mary Rossman, against the law firm of Baker & McKenzie and attorney Martin Greenstein (hereafter the Weeks case). The oral "contractual arrangement" between appellant and respondent provided for appellant to receive "1/6 of the attorney's fee" received in the Weeks case. Appellant's role in the litigation was to "maintain the files," conduct discovery assigned to him by respondent, confer with Weeks in the office, and appear "as co-counsel on her behalf at pretrial hearings. Appellant continued to work on other cases he had at the time. In pleadings filed in the Weeks case, appellant and respondent were both listed as counsel for plaintiffs, at the Sutter Street office address. Appellant also advanced costs and expenses in the case in the amount of $3,356.32.
During discovery in the Weeks case, a dispute arose between appellant and respondent over disclosure to the defendants of confidential records of psychiatric evaluations and treatment of Weeks at the Devereux Foundation "following severe injuries she suffered in an automobile accident as a child," and appellant's perceived efforts to persuade Weeks to settle the case. On September 29, 1993, respondent sent notification by letter to appellant that he had been removed effective immediately "from the Weeks and Rossman cases," with the approval of the clients. In the letter, respondent complained of appellant's "differing approach to these cases" and "failure to consult me on a variety of matters." The letter also confirmed that appellant would "receive the compensation agreed upon" between them earlier: in the event of settlement of the case before depositions, "16.5% of the attorney's fees called for under my agreement with my clients, which is 40% of the monies recovered;" thereafter, an "increase to 28%" of the fees specified under the agreement with the clients; and, reimbursement of the costs advanced by appellant to date.[1] Respondent sent a copy of the letter to Weeks, but did not obtain the client's written consent to appellant's removal from the case or the proposed compensation to be paid to him.
By return letter appellant accepted the compensation in the Weeks case offered by respondent. On September 30, 1993, respondent filed a "Notice of Association and Disassociation of Counsel" in the Weeks case, which stated that Alan B. Exelrod had been "associated as counsel of record" in place of appellant.
By letter dated November 1, 1993, respondent further complained of appellant's *708 "malfeasance" and violation of fiduciary duties to the clients in the Weeks case. Respondent reiterated that appellant would receive the "payment as originally agreed upon of one-sixth of the attorney's fees of forty-percent (40%)" recovered in the Weeks case upon submission of his "time records," but would not receive payment in the "Rossman case." This letter, unlike the letter of September 29, did not show a copy to the clients.
The Weeks case proceeded to jury trial in July of 1994, and resulted in a large award of compensatory and punitive damages for plaintiff Weeks, along with a significant award of attorney fees under Government Code section 12965, subdivision (b). Counsel for respondent and Exelrod informed appellant in a letter sent to him on October 28, 1994, that his "failure to perform legal services" in the Weeks case, the "wholly improper accounting" he provided in his attorney fees billing statement, and unforeseen "changed circumstances," all served "as a basis for abrogation of any agreement" between them as to a division of fees. This letter contained an offer to compensate appellant for his services in the Weeks case in the amount of "$200 per hour for the total number of hours" specified in his prior billing statement. Appellant declined respondent's offer, and suggested mediation of the fee dispute between them.
The judgment in favor of Weeks, including the attorney fee award, was ultimately affirmed on appeal by this court in Weeks v. Baker & McKenzie, supra, 63 Cal. App.4th 1128, 74 Cal.Rptr.2d 510. After the judgment in the Weeks case was satisfied and respondent obtained his attorney fees in September of 1998, the present action for breach of contract and common counts was filed by appellant on May 28, 1999. This appeal is from summary judgment granted in favor of respondent on grounds that the "alleged agreement" between the parties for division of fees is unenforceable as violative of rule 2-200 of the Rules of Professional Conduct, and the common count action for quantum meruit is barred by the governing statutes of limitations (Code Civ. Proc., §§ 337, 339).[2]

DISCUSSION

I. The Validity of the Agreement for Division of Attorney Fees.
Appellant argues that the trial court erred by finding the agreement between the parties for the division of attorney fees in the Weeks case "unenforceable as against public policy" for lack of compliance with rule 2-200, which prohibits any division of "a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder" with the attorney "unless: [¶] (1) The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division."[3] Appellant claims that his agreement *709 with respondent does not fall within the scope of rule 2-200, and even if it does the violation or illegality does not render the contract invalid.
Our task in reviewing the entry of summary judgment in respondent's favor is to determine whether a triable issue of material fact remains to be adjudicated and not to decide the merits of the issues raised. (Flowmaster, Inc. v. Superior Court (1993) 16 Cal.App.4th 1019, 1025, 20 Cal.Rptr.2d 666.) "A motion for summary judgment is properly granted if the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Jackson v. Ryder Truck Rental, Inc. (1993) 16 Cal.App.4th 1830, 1836, 20 Cal.Rptr.2d 913.) "`"`A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiffs asserted causes of action can prevail. [Citation.] ...'"' [Citation.] To succeed, a defendant moving for summary judgment must `conclusively negate a necessary element of the plaintiffs case or establish a complete defense and thereby demonstrate that under no hypothesis is there a material factual issue which requires the process of a trial.' [Citations.]" (Flowmaster, Inc. v. Superior Court, supra, at pp. 1025-1026, 20 Cal.Rptr.2d 666.) We conduct a de novo examination of the evidence and independently review the trial court's determination of questions of law. (Campanano v. California Medical Center (1995) 38 Cal. App.4th 1322, 1327, 45 Cal.Rptr.2d 606; Romero v. American President Lines, Ltd. (1995) 38 Cal.App.4th 1199, 1203, 45 Cal. Rptr.2d 421.)

A. The Application of Rule 2-200 to the Agreement
In our review of the trial court's finding that the agreement was illegal and unenforceable, we first confront appellant's contention that rule 2-200 "is inapplicable" to an agreement between attorneys for division of fees. Appellant argues that rule 2-200 exists for the benefit of the client only, and does not "enable an attorney to confiscate fees legitimately earned by another attorney or confiscate costs advanced by that attorney." He adds that rule 2-200 "was designed only to impact referral fees and was never considered to apply to a situation where attorneys act as co-counsel and share responsibilities, expenses and liabilities."
By its terms, rule 2-200 is not strictly limited to "pure referral" agreements as appellant suggests.[4] The language of the prohibition is much more encompassing; it specifies that an attorney "shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder." (Italics added.) Nothing in rule 2-200 indicates that division of fees for a "pure referral" agreement *710 is proscribed unless it complies with the specified conditions, while a division without consent of the client is permitted if all of the attorneys perform at least some duties or legal services. The proscription is a blunt and broad one that extends to any division of fees for legal services. The clear and unambiguous language of rule 2-200 imposes a categorical restriction on a division of fees without the client's written consent, so we must follow it and decline to read a limitation into the statute. (See Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd. (1999) 19 Cal.4th 1182, 1199, 81 Cal.Rptr.2d 521, 969 P.2d 613; Perko's Enterprises, Inc. v. RRNS Enterprises (1992) 4 Cal.App.4th 238, 244-245, 5 Cal. Rptr.2d 470.)
Appellant's argument that rule 2-200 only applies to referral fees is also inconsistent with the opinion issued by the State Bar, Committee on Professional Responsibility, Formal Opinion No.1994-138. It describes the following criteria used to determine if a division of fees falls within the restrictions of rule 2-200: "whether (1) the amount paid to the outside lawyer is compensation for the work performed and is paid whether or not the law office is paid by the client; (2) the amount paid by the attorney to the outside lawyer is neither negotiated nor based on fees which have been paid to the attorney by the client; and (3) the outside lawyer has no expectation of receiving a percentage fee. If all three criteria are met, there is no division of fees." (2A Cal. Compendium on Prof. Responsibility, State Bar Com. on Prof. Responsibility, Formal Opn. No.1994-138, p. 2.) Here, the fee agreement did not meet all three of these criteria, since appellant had an expectation of receiving a percentage of the contingency fee.
Moreover, we are convinced that the objectives of the Rules of Professional Conduct to protect the public and promote respect and confidence in the legal profession are furthered by including in the purview of rule 2-200 all agreements to divide fees, not just referrals. (Scolinos v. Kolts (1995) 37 Cal.App.4th 635, 639, 44 Cal. Rptr.2d 31.) Attorney fee agreements "are strictly construed against the attorney. (Bennett v. Potter (1919) 180 Cal. 736, 740 [183 P. 156]; Lane v. Wilkins (1964) 229 Cal.App.2d 315, 323 [40 Cal. Rptr. 309].) In order to protect clients and to assure fee agreements are fair and understood by clients, the Legislature enacted numerous statutes specifically delineating the required contents of most attorney fee agreements. (Bus. & Prof.Code, §§ 6146-6148.)" (Alderman v. Hamilton (1988) 205 Cal.App.3d 1033, 1037, 252 Cal. Rptr. 845.) The consumer protection rationale of rule 2-200 is particularly vital where, as here, a contingent fee is split by agreement of attorneys, with the outside attorney paid a percentage of the fee, rather than compensation based upon an hourly rate or other set salary.[5] Disclosure to the client of the allocation of fees and the outside attorney's interest in the case is imperative to facilitate informed consent. Even if all participating attorneys perform legal services and share responsibilities in a case, the client must still be protected by compliance with the disclosure and consent requirements of rule 2-200. Any other interpretation of the rule would be essentially unworkable. If we were to determine that only pure referrals are covered by rule 2-200, attorneys would be easily *711 able to circumvent the intended protections of the rule merely by structuring the agreement to provide that everyone performs some service, even if only of meaningless or trivial value to the case. We accordingly conclude that the agreement between appellant and respondent for division of fees falls within the scope of rule 2-200, despite the shared responsibilities and costs by the two attorneys.

B. The Exception for Partners and Associates.
Next, we confront appellant's contention that his agreement with respondent is exempted from rule 2-200 under the stated exception for "partners and associates." Appellant maintains that his relationship with respondent "constituted a `law firm'" as defined by the Rules of Professional Conduct. He further argues, "where co-counsel actually share the work and costs of suit" in "one joint effort from the client's perspective," a partnership or association exists for purposes of the rule 2-200 exception, even if the attorneys do not "practice with each other in the same law firm at all times." Appellant highlights the parties' common use of his law office, their agreement to "share the profits" in the Weeks case, his contribution of "substantial costs" and performance of legal services in the case, and the listing of their names together on pleadings as counsel for the plaintiffs, to claim that they were partners or associates within the meaning of rule 2-200. He submits that at the very "minimum a triable issue of fact" has been raised by the evidence presented.
The evidence establishes that appellant and respondent did not operate a single law firm together. Rule 1-100(B)(1)(a) provides that a "law firm" means, "two or more lawyers whose activities constitute the practice of law, and who share its profits, expenses, and liabilities."[6] According to the undisputed evidence, appellant and respondent maintained separate law offices with separate identities, addresses, cases, expenses and liabilities. They may have collaborated on the Weeks case and a few others, but they were not members of the same law firm as defined by the Rules of Professional Conduct.
Respondent was also not an "associate" of appellant, which is defined in rule 1-100(B)(4) as "an employee or fellow employee who is employed as a lawyer." Respondent shared space in appellant's independent law office; neither attorney was directly employed by the other. Appellant admitted that he neither had "associates" who worked for his law firm nor was an "associate" with another firm, and was never a salaried employee of respondent. In accordance with the agreement, appellant did not receive a salary or other payment of wages directly from respondent, as would an employee. Instead, his compensation was based upon a percentage of the contingent fee paid to respondent by the client, which constitutes a division of fees under rule 2-200 rather than employment of an associate. (2A Cal. Compendium on Prof. Responsibility, State Bar Com. on Prof. Responsibility, Formal Opn. No. 1994-138, pp. 2-3.)
In the very recent case of Sims v. Charness (2001) 86 Cal.App.4th 884, 103 Cal. Rptr.2d 619, (hereafter Sims), the court reached a contrary conclusion in a dispute *712 between two lawyers over the division of a contingent fee. Charness, who "had the original retainer agreement with the various clients," "brought in Sims with his trial expertise to try the cases," pursuant to an oral agreement between them for Sims to receive "60 percent of the attorney fees due under the client's retainer agreement in the event a favorable verdict were obtained." (Id., at pp. 886-887, 103 Cal. Rptr.2d 619.) Our colleagues in the Second District concluded that if a fee-splitting agreement and relationship between attorneys is not a pure referral, and the outside attorney functions "essentially on the same basis as an employee of the law office," rule 2-200 does not govern their agreement. (Sims, supra, at p. 889, 103 Cal.Rptr.2d 619, italics omitted.)
Although we question the reasoning in Sims, which seems to us to conflict with the very State Bar Committee on Professional Responsibility opinion upon which it purports to rely, the record before us does not support an argument that appellant was an "associate" within the meaning of rule 2-200.[7] The term "associate" in the framework of the practice of law can have diverse meanings in a myriad of contexts. (See Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2000) 111:293, p. 1-64.) While there appears to be a dearth of authority defining the term "associate" within the context of rule 1-100(B)(4), the term is usually employed to describe "a salaried employee of the firm or other lawyer." (Vapnek et al., Cal. Practice Guide: Professional Responsibility, supra, ¶ 1:293, p. 1-64.) Appellant was not a salaried employee. His compensation was exclusively a product of an agreed-upon percentage of the contingent fee which may be recovered in the Weeks case. In contrast to the relationship of the attorneys in Sims, respondent did not enlist appellant's trial services to take advantage of his "greater expertise," but rather essentially joined him in the Weeks case for the use of his office and staff. Appellant did not work exclusively for respondent, as Sims did for Charness. (Sims, supra, 86 Cal.App.4th at p. 891, 103 Cal.Rptr.2d 619.) Further, it appears that appellant performed only minor, basically ministerial pretrial services, and did not continue to participate in the case through its successful conclusion as did the outside attorney in Sims. While respondent fundamentally controlled appellant's involvement in the case, we do not consider this factor dispositive where the compensation arrangement failed to treat appellant as an employee, and instead linked his compensation to the ultimate payment of the contingent fee by the client. We therefore conclude that appellant was not an associate of respondent for purposes of rule 2-200.
Nor were appellant and respondent partners. "A partnership is an association of two or more persons to carry on as co-owners a business for profit. (Civ.Code, § 2400.) Ordinarily the existence of a partnership is evidenced by the right of the respective parties to participate in profits and losses and in the management and control of the business. (Black v. Brundige, 125 Cal.App. 641 [13 P.2d 999]; Smith v. Grove, 47 Cal.App.2d 456 [118 P.2d 324]; Martin v. Sharp & Fellows Cont. Co., 34 Cal.App. 584 [168 P. 373]; 20 Cal.Jur. 689, § 9.)" (Kersch v. Taber (1945) 67 Cal.App.2d 499, 504, 154 P.2d 934.)[8] The parties did not engage in *713 a common enterprise in which they shared profits and control as co-owners of a business. They agreed to split fees in a particular litigation venture, the Weeks case, but otherwise operated entirely separate law firms. Respondent used the facilities and equipment in appellant's office, but paid appellant rent to do so, hardly an indication of a partnership relationship. We conclude that the agreement between appellant and respondent is not saved from the obligations of rule 2-200 by the exception for partners and associates.

C. The Effect of Lack of Compliance with Rule 2-200.
Since the record fails to prove full disclosure to the client in writing that a division of fees would be made and the terms of such division, or the client's written consent for the division of fees, we turn to an examination of the effect of noncompliance with rule 2-200 upon appellant's right to recover from respondent for breach of the agreement.
Appellant claims that a violation of rule 2-200 does not render the contract unenforceable under the facts presented here. His argument is that rule 2-200 is intended to protect the client, not to "enable an attorney to confiscate fees legitimately earned by another attorney or confiscate costs advanced by that attorney." He submits that the "violation of a disciplinary rule may not be interposed as a shield to avoid a contractual duty" by respondent, particularly where the client apparently concurred with the fee-splitting arrangement. (See Potter v. Peirce (Del.1997) 688 A.2d 894, 896.) Hence, his argument concludes, no public policy purpose exists to prevent enforcement of the agreement for division of fees in the present case between two attorneys, despite the illegality.
Courts are reluctant to enforce agreements that are offensive to public policy. (Pacific Gas & Electric Co. v. Superior Court (1993) 15 Cal.App.4th 576, 610-611, 19 Cal.Rptr.2d 295.) "As explained by our Supreme Court: `[T]he courts generally will not enforce an illegal bargain or lend their assistance to a party who seeks compensation for an illegal act. The reason for this refusal is not that the courts are unaware of possible injustice between the parties, and that the defendant may be left in possession of some benefit he should in good conscience turn over to the plaintiff, but that this consideration is outweighed by the importance of deterring illegal conduct. Knowing that they will receive no help from the courts and must trust completely to each other's good faith, the parties are less likely to enter an illegal arrangement in the first place.' (Lewis & Queen v. N.M. Ball Sons (1957) 48 Cal.2d 141, 150 [308 P.2d 713].)" (Waisbren v. Peppercorn Productions, Inc. (1995) 41 Cal.App.4th 246, 262, 48 Cal. Rptr.2d 437.) "This rule is applied not to secure justice between the parties but to promote a societal recognition that certain types of transactions should be discouraged." *714 (Dunkin v. Boskey (2000) 82 Cal. App.4th 171, 183, 98 Cal.Rptr.2d 44.) "Public policy, in the context of a court's refusal to enforce a contract term, may be based on the policy expressed in a statute or the rules of a voluntary regulatory entity, or may be implied from the language of such statute or rule. [Citation.] When the policy of the statute or rule outweighs the interest in enforcement of the contract term, a court will not assist in giving effect to the offending term." (Cariveau v. Halferty (2000) 83 Cal.App.4th 126, 132, 99 Cal.Rptr.2d 417.)
We have observed that "`[w]hether a contract is illegal or contrary to public policy is a question of law to be determined from the circumstances of each particular case.' (Jackson v. Rogers & Wells (1989) 210 Cal.App.3d 336, 349-350 [258 Cal.Rptr. 454].) `Before labeling a contract as being contrary to public policy, courts must carefully inquire into the nature of the conduct, the extent of public harm which may be involved, and the moral quality of the conduct of the parties in light of the prevailing standards of the community.' (Moran v. Harris, supra, 131 Cal.App.3d at p. 920, 182 Cal. Rptr. 519.) [¶] `The question whether a contract violates public policy necessarily involves a degree of subjectivity. Therefore, "... courts have been cautious in blithely applying public policy reasons to nullify otherwise enforceable contracts.... "While contracts opposed to morality or law should not be allowed to show themselves in courts of justice, yet public policy requires and encourages the making of contracts by competent parties upon all valid and lawful considerations, and courts so recognizing have allowed parties the widest latitude in this regard; and, unless it is entirely plain that a contract is violative of sound public policy, a court will never so declare. "The power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt." [Citation.] ... "No court ought to refuse its aid to enforce a contract on doubtful and uncertain grounds. The burden is on the defendant to show that its enforcement would be in violation of the settled public policy of this state, or injurious to the morals of its people." [Citation.]'" [Citations.]' [Citation.]" (Dunkin v. Boskey, supra, 82 Cal. App.4th at pp. 183-184, 98 Cal.Rptr.2d 44.)
An attorney's violation of one of the specified ethical duties to the client is harshly treated as a breach of vital public policy considerations. "It is clearly contrary to the public policy of this state to condone a violation of the ethical duties which an attorney owes to his client. (Academy of California Optometrists, Inc. v. Superior Court [(1975)] 51 Cal.App.3d 999, 1006, 124 Cal.Rptr. 668.) In recognition of this premise, `[contracts which violate the canons of professional ethics of an attorney may for that reason be void.' (Ibid.)" (Kallen v. Delug (1984) 157 Cal. App.3d 940, 951, 203 Cal.Rptr. 879.) The "general rule" holds that "where an attorney violates his or her ethical duties to the client, the attorney is not entitled to a fee for his or her services." (Cal Pak Delivery, Inc. v. United Parcel Service, Inc. (1997) 52 Cal.App.4th 1, 14, 60 Cal.Rptr.2d 207.)
We disagree with appellant's attempts to characterize the fee-splitting agreement as merely one between the two attorneys which did no harm to the client. The Rules of Professional Conduct "are not only ethical standards to guide the conduct of members of the bar; but they also serve as an expression of public policy to protect the public." (Altschul v. Sayble *715 (1978) 83 Cal.App.3d 153, 163, 147 Cal. Rptr. 716.) We do not have before us an innocent party, unencumbered by the ethical rules that govern attorneys, who seeks to enforce the fee-splitting contract. (Cf., Cain v. Burns (1955) 131 Cal.App.2d 439, 442-443, 280 P.2d 888.) Appellant is at least equally culpable as respondent by entering into a contract that contravenes public policy by failing to include terms and conditions necessary to protect the client. Although the client has not personally sought to void the agreement in this litigation, we must nevertheless further the public policy objectives of rule 2-200 by denying enforcement of a fee-sharing arrangement that fails to fulfill the requirements of disclosure and informed written consent. The rule that the courts will withhold relief under the terms of an illegal contract or agreement which is violative of public policy is "`intended to prevent the guilty party from reaping the benefit of his wrongful conduct, or to protect the public from the future consequences of an illegal contract.'" (Jacobs v. Universal Development Corp. (1997) 53 Cal.App.4th 692, 700, 62 Cal.Rptr.2d 446, quoting Tri-Q, Inc. v. Sta-Hi Corp. (1965) 63 Cal.2d 199, 218 [45 Cal.Rptr. 878, 404 P.2d 486].) The public policy violation is found in the fee-splitting contract itself, and a participating attorney may not obtain enforcement of it. (See Cain v. Burns, supra, at p. 442, 280 P.2d 888.) Recovery by an attorney under an illegal agreement that violates the canons of professional ethics cannot be countenanced. (Birbrower, Montalbano, Condon & Frank v. Superior Court (1998) 17 Cal.4th 119, 138, 70 Cal.Rptr.2d 304, 949 P.2d 1; Campagna v. City of Sanger (1996) 42 Cal. App.4th 533, 542, 49 Cal.Rptr.2d 676; Kallen v. Delug, supra, 157 Cal.App.3d at pp. 945-946, 203 Cal.Rptr. 879.)
In Scolinos v. Kolts, supra, 37 Cal.App.4th 635, 44 Cal.Rptr.2d 31, summary judgment was granted in favor of the defendant attorneys in the plaintiff attorney's action for breach of an agreement to pay him a referral fee share of the attorney fees paid by the client. On appeal, the court bluntly concluded that "because it is uncontroverted there was no compliance with rule 2-108," the predecessor to rule 2-200, "the alleged referral fee agreement is unenforceable on public policy grounds." (Scolinos v. Kolts, supra, at p. 640, 44 Cal.Rptr.2d 31.) The same court very recently in Margolin v. Shemaria (2000) 85 Cal.App.4th 891, 102 Cal.Rptr.2d 502, reaffirmed its ruling that noncompliance with rule 2-200 renders a fee-sharing agreement unenforceable, despite evidence that the defendant referring attorney, Shemaria, not only promised the plaintiffs to facilitate fulfillment of the requirements of the rule, but also explained the referral contract to the client and obtained her oral consent to it.[9] We see no reason to depart from the rationale in Scolinos and Margolin, and therefore conclude that the agreement between appellant and respondent for division of fees is unenforceable on public policy grounds.[10]
*716 We further reject appellant's contention that substantial compliance with rule 2-200 renders the agreement enforceable. According to the judicial doctrine of substantial compliance articulated by our Supreme Court in Asdourian v. Araj (1985) 38 Cal.3d 276, 282-283, 211 Cal.Rptr. 703, 696 P.2d 95, "`literal compliance' " with a regulatory statute may not be demanded "`in the situation in which the party seeking to escape his obligation has received the full protection which the statute contemplates.'" (Id., at pp. 282-283, 211 Cal.Rptr. 703, 696 P.2d 95, quoting Latipac, Inc. v. Superior Court (1966) 64 Cal.2d 278, 279-280 [49 Cal.Rptr. 676, 411 P.2d 564]; see also Construction Financial v. Perlite Plastering Co. (1997) 53 Cal.App.4th 170, 180, 61 Cal.Rptr.2d 574.) "`Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.'" (Jacobs v. Universal Development Corp., supra, 53 Cal.App.4th at pp. 699-700, quoting Norwood v. Judd (1949) 93 Cal.App.2d 276, 288-289 [209 P.2d 24].)
We find no substantial compliance with the requirement of written consent by the client. Contrary to appellant's suggestion, we cannot infer compliance with rule 2-200 in the present case from evidence of respondent's customary use of written contingency fee retainer agreements with his other clients that authorized his use of cocounsel without an increase in attorney fees. Nor does the reference to the client's concurrence with the termination of appellant as cocounsel in the letter of September 29, 1993, constitute fulfillment "in substance" with the conditions imposed by rule 2-200 for a valid agreement to divide a fee for legal services. The letter did not precede or accompany the fee-splitting agreement, and did not furnish the client's consent to the division of fees in writing, as rule 2-200 demands, but rather was merely counsel's declaration of the client's approval of appellant's removal from the Weeks case long after the division had been agreed upon. The letter also does not contain the requisite disclosure to the client "in writing that a division of fees will be made and the terms of such division." (See Campagna v. City of Sanger, supra, 42 Cal.App.4th at p. 542, 49 Cal. Rptr.2d 676.) Neither the letter nor any other evidence even approaches substantial compliance with rule 2-200.
Further, the doctrine of substantial compliance cannot be invoked here. We are not unmindful that this fee dispute is between attorneys only, and does not involve a client. We also realize that respondent appears to be taking advantage of his own violation of the professional rules. Even so, rule 2-200 exists to protect the public and to benefit clients by insuring that fee agreements are fair and understood. (Margolin v. Shemaria, supra, 85 Cal.App.4th at p. 901, 102 Cal. Rptr.2d 502.) To enforce the fee-sharing agreement despite noncompliance with rule 2-200 "would thwart the focus and the object of rule 2-200, which is consumer protection, not attorney protection. The consumer protection comes from the attorney's written disclosure and the client's written consent, just as the consumer protection *717 for clients of licensed real estate brokers comes from the necessity of having a written contract for broker's fees." (Margolin v. Shemaria, supra, at p. 902, 102 Cal.Rptr.2d 502.) Without stringent and complete compliance with professional ethical standards, the fee agreement cannot be enforced. (See Alderman v. Hamilton, supra, 205 Cal.App.3d at p. 1037, 252 Cal.Rptr. 845.) The recognized public policy to strictly enforce violations of ethical duties which attorneys owe to their clients precludes recovery by appellant under the terms of the illegal and void agreement with respondent for division of fees. (Margolin v. Shemaria, supra, at p. 903, 102 Cal.Rptr.2d 502; Scolinos v. Kolts, supra, 37 Cal.App.4th at p. 640, 44 Cal. Rptr.2d 31; Kallen v. Delug, supra, 157 Cal.App.3d at p. 951, 203 Cal.Rptr. 879.)

II. The Quantum Meruit Cause of Action.
We turn to appellant's claim for recovery in quantum meruit for the reasonable value of the legal services he provided before his termination by respondent. Appellant maintains that if the "agreement for division of fees is voided," he is nevertheless entitled to recover for the reasonable value of his services and the costs he advanced under a quantum meruit theory. He asks for an award based upon "a reasonable division of the contingency fee ultimately received."

A. Appellant's Entitlement to Quantum Meruit Recovery Following His Dismissal.
We proceed from the fundamental premise that an illegal contract may be enforced to avoid unjust enrichment or to prevent unconscionable injury. (Asdourian v. Araj, supra, 38 Cal.3d at p. 292, 211 Cal.Rptr. 703, 696 P.2d 95.) "`The effect of illegality on a transaction depends on the facts and equities of the particular case.' [Citation.] In each case, the extent of enforceability and the type of remedy granted depend upon a variety of factors, including the nature of the illegality, the policies to be served by enforcing or denying enforcement of the agreement, and the relative culpability and equities of the parties. [Citations.] The `appropriate remedy would depend upon a weighing of these factors.' [Citation.]" (Dunkin v. Boskey, supra, 82 Cal.App.4th at pp. 196-197, 98 Cal.Rptr.2d 44; see also Arya Group, Inc. v. Cher (2000) 77 Cal.App.4th 610, 614-615, 91 Cal.Rptr.2d 815.)
"A quantum meruit or quasi-contractual recovery rests upon the equitable theory that a contract to pay for services rendered is implied by law for reasons of justice. See, e.g., 1 Witkin, Summary of California Law (9th ed. 1987) Contracts, sections 12, page 47; 91, pages 122-123; 112, pages 137-138." (Hedging Concepts, Inc. v. First Alliance Mortgage Co. (1996) 41 Cal.App.4th 1410, 1419, 49 Cal.Rptr.2d 191.) We agree with appellant that his quantum meruit cause of action is cognizable, but the award cannot be based upon a division of the contingency fee. An attorney engaged pursuant a contingent fee agreement and discharged prior to occurrence of the contingency may recover in quantum meruit recovery for the reasonable value of services rendered up to the time of discharge, rather than the full amount of the agreed contingent fee. (Cazares v. Saenz (1989) 208 Cal.App.3d 279, 285-286, 256 Cal. Rptr. 209.) We recognize that appellant seeks recovery based upon a void fee-splitting agreement between attorneys, but we are persuaded that the illegality does not foreclose a quantum meruit cause of action. Although both appellant and respondent failed to comply with the requirements of rule 2-200, appellant did *718 perform legal services and advanced costs in the Weeks case that contributed some benefit to the client and respondent.
Despite violation of ethical duties to a client, the appellate courts have "allowed partial fee recovery or acknowledged that some fees could be recovered by the attorney: (1) where there was no objection by the client (Clark v. Millsap [(1926)] 197 Cal. 765, 242 P. 918); (2) for services rendered before the ethical breach (Jeffry v. Pounds [(1977)] 67 Cal.App.3d 6, 136 Cal.Rptr. 373); or (3) on an unjust enrichment theory where the client's recovery was a direct result of the attorney's services (Estate of Falco [(1987)] 188 Cal. App.3d 1004, 233 Cal.Rptr. 807)." (Cal Pak Delivery, Inc. v. United Parcel Service, Inc., supra, 52 Cal.App.4th at p. 16, 60 Cal.Rptr.2d 207.) Nothing in the record reveals that appellant's relations with the client are tainted with fraud, or that the client objected to the agreement by which appellant acted as cocounsel, at least until the distinct alleged acts that precipitated his discharge. The evidence before us does not even indicate that appellant was aware of the breach of rule 2-200 during the course of his representation of the plaintiff in the Weeks case. As between appellant and respondent, appellant does not appear to be a more culpable party. Respondent apparently enlisted appellant's assistance and proposed the ultimately illegal arrangement between them for the division of fees.[11] We think that under the facts presented, the objectives of rule 2-200 are effectively served by denying appellant the benefit of the illegal contingent fee-splitting contract, without further precluding him from any reimbursement for the costs he contributed in the Weeks case and compensation in quantum meruit for the reasonable value of his legal services rendered on behalf of the cause. (See Cal Pak Delivery, Inc. v. United Parcel Service, Inc., supra, at p. 16, 60 Cal.Rptr.2d 207; Franklin v. Appel (1992) 8 Cal.App.4th 875, 893-894, 10 Cal. Rptr.2d 759; Jeffry v. Pounds, supra, at p. 12, 136 Cal.Rptr. 373.)[12]
*719 "The classic formulation concerning the measure of recovery in quantum meruit is found in Palmer v. Gregg [(1967)] 65 Cal.2d 657, 56 Cal.Rptr. 97, 422 P.2d 985. Justice Mosk, writing for the court, said: `The measure of recovery in quantum meruit is the reasonable value of the services rendered provided they were of direct benefit to the defendant.' (Id. at p. 660, 56 Cal.Rptr. 97, 422 P.2d 985; see also Producers Cotton Oil Co. v. Amstar Corp. (1988) 197 Cal.App.3d 638, 659 [242 Cal.Rptr. 914].)" (Maglica v. Maglica (1998) 66 Cal.App.4th 442, 449, 78 Cal. Rptr.2d 101, italics omitted.) The doctrine "that a client must pay the reasonable value of the attorney's services performed up to the time of discharge is `qualified by the rule that acts of impropriety inconsistent with the character of the legal profession and incompatible with the faithful discharge of professional duties will prevent an attorney from recovering for his [or her] services. [Citations.]' [Citation.]" (Cal Pak Delivery, Inc. v. United Parcel Service, Inc., supra, 52 Cal.App.4th at p. 15, 60 Cal.Rptr.2d 207.) Thus, appellant is not entitled to recovery following any proved acts of impropriety inconsistent with the character of the profession, and incompatible with the faithful discharge of his duties in the Weeks case.[13]

B. The Statute of Limitations Defense.
We turn finally to appellant's contention that the trial court erred by finding his quantum meruit action barred by the statute of limitations. The court determined that appellant's cause of action "accrued in September 1993 when he ceased working on the case," and thus the "two and four year statutes of limitation" (§§ 337, 339) lapsed before he filed his complaint in May of 1999. Appellant argues that the quantum meruit claim did not accrue until the contingency occurred, when final judgment in the Weeks case was rendered and the attorney fees were collected. We agree.
The statute of limitations for a quantum meruit claim is two years. (Code Civ. Proc., § 339; Iverson, Yoakum, Papiano & Hatch v. Berwald (1999) 76 Cal. App.4th 990, 996, 90 Cal.Rptr.2d 665.) Also settled is the fundamental rule that a statute of limitations begins to run no earlier than upon accrual of the cause of action, which is upon the occurrence of the last essential element. (Spear v. California State Auto. Assn. (1992) 2 Cal.4th 1035, 1040, 9 Cal.Rptr.2d 381, 831 P.2d 821.) Until the defendant's conduct causes damages to the plaintiff, no cause of action has been generated and the period of limitations is not triggered. (Budd v. Nixen (1971) 6 Cal.3d 195, 200-201, 98 Cal.Rptr. 849, 491 P.2d 433.) The courts "generally now subscribe to the view that the period cannot run before plaintiff possesses a true cause of action, by which we mean that events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages." (Davies v. Krasna (1975) 14 Cal.3d 502, 513, 121 Cal. Rptr. 705, 535 P.2d 1161.)
In cases of an attorney discharged by the client, quantum meruit recovery for work performed on a contingency fee matter is not available until "after the matter is concluded successfully." (Trimble v. Steinfeldt, supra, 178 Cal.App.3d at pp. 651-652, 224 Cal.Rptr. 195, italics added.) The cause of action "does not accrue until *720 the occurrence of the stated contingency, i.e., recovery by the client either by settlement or judgment." (Kroff v. Larson (1985) 167 Cal.App.3d 857, 860, 213 Cal. Rptr. 526; see also Fracasse v. Brent (1972) 6 Cal.3d 784, 792, 100 Cal.Rptr. 385, 494 P.2d 9.) "Any contrary rule would be palpably unjust." (Brown v. Connolly (1969) 2 Cal.App.3d 867, 870, 83 Cal.Rptr. 158.) If the client never achieves a recovery, the contemplated contingency has not occurred and the discharged attorney will be denied compensation or reimbursement of costs. (Estate of Linnick (1985) 171 Cal.App.3d 752, 762, 217 Cal.Rptr. 552; Kroff v. Larson, supra, at p. 860, 213 Cal.Rptr. 526.) In fact, until recovery by the client satisfies the contingency, any action by the attorney to recover fees is premature. (Kroff v. Larson, supra, at p. 861, 213 Cal.Rptr. 526; Mason v. Levy & Van Bourg (1978) 77 Cal.App.3d 60, 66, 143 Cal.Rptr. 389; Bandy v. Mt. Diablo Unified Sch. Dist. (1976) 56 Cal.App.3d 230, 234, 126 Cal.Rptr. 890.)
We can perceive of no reason why a similar rule should not apply in this case. Until the Weeks case was successfully concluded, there was no benefit to the client or respondent. The Weeks case was concluded by final judgment in September of 1998. Appellant's quantum meruit action did not accrue until, following the final judgment, respondent received the contingent fee for legal services rendered in the successful litigation. Thus, the action for quantum meruit filed in May of 1999, was well within the governing statute of limitations.

DISPOSITION
Accordingly, the judgment in favor of respondent on the quantum meruit cause of action is reversed and the case is remanded to the trial court for proceedings not inconsistent with the views expressed herein. In all other respects, the judgment is affirmed. The parties are to bear their own costs on appeal.
STRANKMAN, P.J., and MARCHIANO, J., concur.
NOTES
[1] The record before us does not contain the fee agreement between respondent and the clients. It appears that respondent was successful in preventing disclosure of this agreement. Although appellant observes in a footnote in his opening brief that the issue of disclosure of this document "presents an interesting conundrum," it is an issue that is not argued in this appeal.
[2] All further references to rules are to the Rules of Professional Conduct; all further statutory references are to the Code of Civil Procedure, unless otherwise indicated.
[3] In full rule 2-200 reads: "(A) A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless:

"(1) The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division; and
"(2) The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable as that term is defined in rule 4-200.
"(B) Except as permitted in paragraph (A) of this rule or rule 2-300, a member shall not compensate, give, or promise anything of value to any lawyer for the purpose of recommending or securing employment of the member or the member's law firm by a client, or as a reward for having made a recommendation resulting in employment of the member or the member's law firm by a client. A member's offering of or giving a gift or gratuity to any lawyer who has made a recommendation resulting in the employment of the member or the member's law firm shall not of itself violate this rule, provided that the gift or gratuity was not offered in consideration of any promise, agreement, or understanding that such a gift or gratuity would be forth-coming or that referrals would be made or encouraged in the future."
[4] A "`pure referral'" arrangement is one "`which compensates one lawyer with a percentage of a contingent fee for doing nothing more than obtaining the signature of a client upon a retainer agreement while the lawyer to whom the case is referred performs the work....'" (Moran v. Harris (1982) 131 Cal. App.3d 913, 921, 182 Cal.Rptr. 519, citation omitted.)
[5] We thus delineate an important distinction between the present case and the situation in which one attorney requests another to make a special court appearance or perform particular services on a case without remuneration or for a fixed compensation which is not derived from any fee paid by the client. The latter situation is not before us, but we observe that it would not constitute a division of fees within the meaning of rule 2-200.
[6] In full, rule 1-100(B)(1) defines "law firm" as follows: "(a) two or more lawyers whose activities constitute the practice of law, and who share its profits, expenses, and liabilities; or [¶] (b) a law corporation which employs more than one lawyer; or [¶] (c) a division, department, office, or group within a business entity, which includes more than one lawyer who performs legal services for the business entity; or (d) a publicly funded entity which employs more than one lawyer to perform legal services."
[7] We also observe that the Sims opinion appears to confuse and mingle two separate issues: first, whether the agreement to divide fees falls within rule 2-200; and second, whether the exception for partners and associates applies to the agreement.
[8] The current Corporations Code section 16101, subdivision (7) states: "`Partnership' means an association of two or more persons to carry on as coowners a business for profit formed under Section 16202, predecessor law, or comparable law of another jurisdiction, and includes, for all purposes of the laws of this state, a registered limited liability partnership, and excludes any partnership formed under Chapter 2 (commencing with Section 15501) or Chapter 3 (commencing with Section 15611)." The 1996 Legislature adopted the Uniform Partnership Act of 1994 (Corp. Code, 16100 et seq.), effective January 1, 1997, and applicable to partnerships formed on or after that date. The original Uniform Partnership Act (Corp.Code, § 15001 et seq.), including the provisions on limited liability partnerships (Corp.Code, § 15047 et seq.), was repealed in 1996, operative January 1, 1999, but continued until that date to govern partnerships formed before January 1, 1997. On January 1, 1999, the 1994 Act replaced the UPA with respect to all partnerships.
[9] The court in Margolin v. Shemaria, supra, 85 Cal.App.4th at page 903, footnote 7, 102 Cal.Rptr.2d 502, noted the possible application of the doctrine of equitable estoppel in a case such as the one before us. Appellant in this appeal does not argue that respondent is equitably estopped by his conduct from challenging the legality of their agreement. We therefore do not consider the applicability of this legal theory.
[10] Appellant's reliance upon the opinion in Breckler v. Thaler (1978) 87 Cal.App.3d 189, 151 Cal.Rptr. 50, is unavailing. In that case, the court concluded that where "there were substantial services performed and responsibilities assumed by the original attorneys," (id., at p. 196, 151 Cal.Rptr. 50) the consent of the client was obtained after full disclosure, and the total fee was not increased by the fee-splitting agreement, the "requirements of rule 2-108 were satisfied in this case and ... the contract between attorneys for dividing the fees was valid and enforceable." (Id., at p. 197, 151 Cal.Rptr. 50.) Rule 2-108 did not then require the client's written consent to the division of fees between attorneys, and no violation of the rule was found.
[11] Any argument by respondent that the responsibility to effectuate compliance with rule 2-200 was somehow borne by appellant alone is categorically mistaken. Both attorneys to the fee-splitting agreement had an ethical duty to abide by the Rules of Professional Conduct, and both of them failed to do so. Respondent merely has the good fortune to be the attorney opposing enforcement of the agreement.
[12] Cal Pak Delivery, Inc. v. United Parcel Service, Inc., supra, 52 Cal.App.4th 1, 60 Cal. Rptr.2d 207, was a class action against a provider of shipping services for overcharges and exemplary damages, in which the trial court disqualified plaintiff's counsel for attempting to "sell out his client and the class the client was seeking to represent." (Id., at pp. 5-6, 60 Cal.Rptr.2d 207.) The trial court's order "that he be prohibited from receiving any fees" in connection with the case was found to be overbroad. (Id., at pp. 14-16, 60 Cal.Rptr.2d 207.) The court concluded that while an attorney generally is not entitled to fees where he has violated ethical duties to the client, plaintiff's counsel may be entitled to an award of attorney fees for services during the three years before committing the actions resulting in his disqualification under a quantum meruit theory, depending on the ultimate outcome of the litigation. (Ibid.)

In Franklin v. Appel, supra, 8 Cal.App.4th at page 893, 10 Cal.Rptr.2d 759, the court found that the contingency fee agreement was not void as violative of Business and Professions Code section 6147, but indicated that if the agreement had been illegal a "resort to a quantum meruit measure of damages" would have been proper.
In Jeffry v. Pounds, supra, 67 Cal.App.3d 6, 136 Cal.Rptr. 373, the court held counsel's breach of rules of professional conduct prohibiting an attorney from representing conflicting interests except with written consent of all parties did not prohibit quantum meruit recovery, limited to the value of services rendered before the date of the violation. (Id., at p. 12, 136 Cal.Rptr. 373.)
[13] We add that appellant is of course not entitled to receive his compensation from any recovery awarded to the plaintiff in the Weeks case, but only directly from respondent. (Trimble v. Steinfeldt (1986) 178 Cal.App.3d 646, 652, 224 Cal.Rptr. 195.) We express no further opinion on the appropriate compensation to be awarded to appellant.